**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WILD FISH CONSERVANCY and HARRIET S. BULLITT, *Plaintiffs-Appellants*, <br><br> v. <br><br> SALLY JEWELL[*], in her official capacity as Secretary of the United States Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR; SAM D. HAMILTON, in his official capacity as Director of the United States Fish and Wildlife Service; U.S. FISH & WILDLIFE SERVICE; DAVE IRVING, in his official capacity as Leavenworth National Fish Hatchery Complex Manager; MICHAEL L. CONNOR, in his official capacity as the Commissioner of the Bureau of Reclamation; UNITED STATES BUREAU OF RECLAMATION, *Defendants-Appellees*. | No. 10-35303 <br><br> D.C. No. 2:09-cv-00206-LRS <br><br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of Washington
Lonny R. Suko, District Judge, Presiding

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Secretary of the Interior Sally Jewell is substituted for her predecessor, Kenneth Lee Salazar.

Argued and Submitted
May 7, 2013—Seattle, Washington

Filed September 11, 2013

Before: Sidney R. Thomas and Jacqueline H. Nguyen,
Circuit Judges, and Raymond J. Dearie, Senior District
Judge.[**]

Opinion by Judge Thomas

## SUMMARY[***]

### Standing / Jurisdiction

The panel dismissed an action brought by the Wild Fish Conservancy challenging the United States' diversion of water from Icicle Creek, a tributary of the Wenatchee River and the Columbia River, to the Leavenworth National Fish Hatchery.

The panel held that the Conservancy lacked prudential standing to bring an Administrative Procedure Act challenge alleging that the federal defendants violated section 8 of the Reclamation Act of 1902 by failing to comply with the Washington water code's permit requirement. The panel also

_____

[**] The Honorable Raymond J. Dearie, Senior District Judge for the U.S. District Court for the Eastern District of New York, sitting by designation.

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

held that it lacked jurisdiction over the Conservancy's claim that the federal defendants violated Washington's fishway law, Wash. Rev. Code § 77.57.030(1), by failing to submit fishway plans to the Department of Fish & Wildlife and by failing to maintain durable and efficient fishways across hatchery structures, because these requirements were not incorporated into section 8 of the Reclamation Act. Finally, the panel held that it lacked jurisdiction over the Conservancy's claim that the Secretary of the United States Department of Interior's failure to supply Hatchery fishways with adequate water violated the Reclamation Act, because that claim did not challenge a final agency action and consequently was not reviewable under the Administrative Procedure Act.

**COUNSEL**

Brian A. Knutsen (argued) and Richard A. Smith, Smith & Lowney, PLLC, Seattle, Washington, for Plaintiffs-Appellants.

Charles R. Shockey, David C. Shilton, and Robert P. Stockman (argued), United States Department of Justice, Washington, D.C., Defendants-Appellees.

**OPINION**

THOMAS, Circuit Judge:

The historian Donald Worster described the Columbia River as the river that died and was reborn as money.[1]  The Columbia River Basin was once home to one of the world's largest salmon runs, but over the course of the twentieth century the mainstem Columbia and its tributaries were radically re-engineered to become the most hydroelectrically developed river system in the world, incorporating more than one hundred and fifty dams.  *Nw. Res. Info. Ctr., Inc. v. Nw. Power Planning Council*, 35 F.3d 1371, 1375 (9th Cir. 1994). In combination with deforestation, over-fishing, irrigated agriculture, grazing, mining, and urbanization, the hydropower system reduced native salmon and steelhead populations from levels of mythic abundance to the brink of extinction.  *Id.* at 1375–76.

This appeal concerns the control of water necessary to sustain native fish populations in Icicle Creek, a tributary of the Wenatchee River, which is itself a tributary of the Columbia.  The Wild Fish Conservancy and Harriet S. Bullitt (collectively, "the Conservancy") allege that the United States is improperly diverting water from Icicle Creek to the Leavenworth National Fish Hatchery (the "Hatchery") and otherwise violating Washington state law.  We conclude that the Conservancy lacks prudential standing to bring its claim that the Hatchery operation violates the Washington water code, and that we lack jurisdiction to consider the Convervancy's other claims because they either do not challenge final agency action or rest on provisions of

---

[1] DONALD WORSTER, RIVERS OF EMPIRE 276 (1985).

Washington law that are not incorporated into federal reclamation law. Therefore, on de novo review,[2] we dismiss this action.[3]

I

Congress authorized construction of the Hatchery to mitigate the adverse impact of the Grand Coulee Dam on native fish in the Columbia River Basin. The Conservancy claims that the Hatchery is subject to section 8 of the Reclamation Act of 1902 ("section 8"), which requires that federal reclamation projects operate in compliance with state water law. 43 U.S.C. § 383. According to the Conservancy, the United States Secretary of the Interior and subordinate officials responsible for operating the Hatchery (collectively, the "Federal Defendants") violate section 8 by diverting water from Icicle Creek without a permit required by the

---

[2] As always, we review de novo the district court's jurisdictional determination, *Atwood v. Fort Peck Tribal Court Assiniboine*, 513 F.3d 943, 946 (9th Cir. 2008), and its grant of summary judgment to the Hatchery officials, *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). We likewise review questions of standing de novo. *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 937 (9th Cir. 2005).

[3] The district court granted summary judgment in favor of the Hatchery officials, holding that the Conservancy's claims are untimely. *Wild Fish Conservancy v. Salazar*, 688 F. Supp. 2d 1225, 1237 (E.D. Wash. 2010). In the alternative, the district court concluded that it should abstain from adjudicating the Conservancy's claims under the doctrine of primary jurisdiction. *Id.* at 1238. Because administration of the Washington water code and fishway law is committed to the Washington State Departments of Ecology and Fish and Wildlife, respectively, the district court held that the Conservancy should direct its claims to those agencies instead of the federal courts. *Id.* Given our resolution of the issues, we need not decide whether the district court properly found the Conservancy's claims time-barred or subject to the doctrine of primary jurisdiction.

Washington water code, Wash. Rev. Code § 90.03.250, and by failing to provide adequate fish ladders as required by Washington's fishway law, Wash. Rev. Code. § 77.57.030.

When the Hatchery was completed in 1941, fish were initially reared in a one-mile segment of Icicle Creek—referred to by the parties as the "Historic Channel"—equipped with dams and weirs to create holding ponds. A four-thousand foot canal—the "Hatchery Canal"—was constructed adjacent to the Historic Channel. The Hatchery Canal splits off from the Historic Channel at "structure 2"—a dam with radial gates that control the amount of water flowing downstream through the Hatchery. The Canal runs roughly parallel to the Historic Channel for about one mile and then rejoins the Historic Channel immediately downstream of "structure 5." When the gates at structure 2 are open, most of Icicle Creek's flow travels down the Historic Channel. When the gates are closed, most of the creek's flow travels down the Hatchery Canal. Thus, closing the gates at structure 2 significantly, and sometimes entirely, dewaters the one-mile segment of the Historic Channel between structures 2 and 5. When this occurs, fish cannot swim up the Historic Channel to spawning grounds above the Hatchery. Though fish-rearing operations at the Hatchery were moved to off-channel holding ponds in 1979, Hatchery officials continue to close the gates at structure 2 at various times during the year. The following illustration helps explain the operation:



Figure 1. Leavenworth National Fish Hatchery and Vicinity

With this context in mind, we turn to the Conservancy's claims.

II

A

The Conservancy's first claim alleges that the Federal Defendants violate section 8 of the Reclamation Act, 43 U.S.C. § 383, by diverting water from Icicle Creek at structure 2 without a state permit. Washington law prohibits diversions without a permit from the Washington Department of Ecology ("Department of Ecology"). Wash. Rev. Code § 90.03.250.[4] The Conservancy argues that this state law provision applies to the Hatchery by virtue of section 8 of the Reclamation Act, which provides that nothing in that Act

> shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner,

---

[4] The Federal Defendants have secured permits from the Department of Ecology to divert water for Hatchery operations at other locations along Icicle Creek. However, under Washington law a water right is limited to the point of diversion specified in the permit, and the holder of a water right cannot change the diversion point without authorization from the Department of Ecology. Wash. Rev. Code § 90.03.380(1). Thus, the fact that the Federal Defendants have permits to divert water at other points along Icicle Creek does not itself establish their right to divert water at structure 2.

> appropriator, or user of water in, to, or from any interstate stream or the waters thereof.

43 U.S.C. § 383. Section 8 requires the federal government to follow state law when acquiring water rights for federal reclamation projects and distributing project water, unless the relevant state law conflicts with an express congressional enactment. *California v. United States*, 438 U.S. 645, 650, 674–75 (1978). Thus, state law restrictions on the acquisition and use of water for federal reclamation projects "are incorporated into the Reclamation Act so long as they are consistent with other federal law." *San Luis Unit Food Producers v. United States*, 709 F.3d 798, 806 (9th Cir. 2013).

At the outset, the parties dispute whether the Reclamation Act applies to the Hatchery and whether the Washington water code's permit requirement is a state law "relating to the control, appropriation, use, or distribution of water used in irrigation" such that it is incorporated into section 8. Additionally, the parties disagree as to whether directing water from Icicle Creek into the Hatchery Canal, which rejoins the Historic Channel after less than a mile, constitutes a "diversion" as a matter of state law. We need not decide these questions because the Conservancy lacks prudential standing.

### B

Because the Reclamation Act does not create a private right of action, the Conservancy brought suit under the Administrative Procedure Act ("APA"), which provides a cause of action for persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute."

5 U.S.C. § 702. This provision requires that, in addition to demonstrating constitutional standing, a plaintiff "must assert an interest 'arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) (quoting *Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). The purpose of this prudential standing requirement is "'to exclude those plaintiffs whose suits are more likely to frustrate rather than to further statutory objectives.'" *Id.* (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 n.12 (1987)). The test "'is not meant to be especially demanding.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Clarke*, 479 U.S. at 399). "[T]he benefit of any doubt goes to the plaintiff." *Ibid.* Still, the "zone of interests" standard forecloses suit "when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clarke*, 479 U.S. at 399).

The focal point of the prudential standing inquiry is "the statute whose violation is the gravamen of the complaint." *Air Courier Conference of Am. v. Am. Postal Workers Union, AFL-CIO*, 498 U.S. 517, 529 (1991) (internal quotation marks and citation omitted). Here, the relevant statutory provision is section 8 of the Reclamation Act. 43 U.S.C. § 383.[5]

---

[5] To the extent it is incorporated into section 8, we may also consider the Washington water code provision that the Conservancy seeks to enforce, as it bears an "integral relationship" to section 8. *See Air Courier Conference*, 498 U.S. at 530. However, demonstrating that the Conservancy's claims fall within the zone of interests of the state law

In *California v. United States*, the Supreme Court explained that section 8 advances the Reclamation Act's goal of "cooperative federalism" and maintains the longstanding tradition of federal deference to state water law. 438 U.S. at 650, 653. By requiring federal reclamation projects to comply with state water law, Congress aimed to avoid "the legal confusion that would arise if federal water law and state water law reigned side by side in the same locality." *Id.* at 668–69. Congress also wished to avoid serious constitutional questions regarding its authority "to override the States' regulation of waters within their borders." *Id.* at 669. To that end, section 8 ensures that the operation of federal reclamation projects within state borders will not affect or interfere with the States' sovereign authority to regulate the appropriation and use of state waters or the protected property interests of parties with vested water rights under state law.

At a high level of generality, the Conservancy's interest in ensuring the Hatchery's compliance with the Washington water code's permit requirement aligns with section 8's mandate that federal reclamation projects follow state water law. But as we have explained, the purpose of section 8 is to protect the State's sovereign authority to regulate the appropriation and use of state waters. *California*, 438 U.S. at 653 (describing unbroken tradition of State sovereignty in the field of water law); *United States v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 212 (9th Cir. 1989). Section 8 serves this purpose by mandating that the presence and operation of

---

provision at issue is a necessary but not sufficient condition to establishing the Conservancy's prudential standing to pursue an APA claim, which ultimately rests on section 8 of the Reclamation Act. Because we find that the Conservancy's first claim does not fall within the zone of interests protected by section 8, it lacks prudential standing.

federal reclamation projects shall not "in any way affect" the operation of state water law nor the rights of any entity thereunder.   43 U.S.C. § 383.   Here, however, the Conservancy invokes § 8 expressly in order to "affect"—more specifically, to enlarge—its rights as a water user under state law.

It is undisputed that the Department of Ecology has exclusive authority to administer and enforce the Washington water code.  *See, e.g.,*  Wash. Rev. Code §§ 43.21A.064 (granting the Department of Ecology plenary authority to regulate state water resources), 43.27A.190 (granting the Department of Ecology authority to issue regulatory orders to compel compliance with water code), 90.03.605 (describing enforcement procedures).   To be sure, parties holding perfected water rights under state law have an enforceable property interest in such rights.  *Rettkowski v. Dep't of Ecology*, 858 P.2d 232, 237 (Wash. 1993) (en banc). However, the Conservancy does not have any rights to water in Icicle Creek.   Thus, as it rightly conceded, the Conservancy lacks the right to independently enforce the water code's permit requirement or compel enforcement action by the Department of Ecology.[6]  *Cf.* Wash. Rev. Code

---

[6] We do not question that the Conservancy has an *interest* in the waters of Icicle Creek and in ensuring that sufficient water remains in the creek to sustain fish and wildlife and maintain scenic values.  That interest is protected under state law by the minimum instream flow rules the Department of Ecology established for Icicle Creek.  Wash. Admin. Code §§ 173-545-050 (1983), 173-545-060 (2001).  Washington law protects instream flows set by rule from impairment by junior users and unpermitted diversions to the same extent as it protects all other vested water rights.  Wash. Rev. Code § 90.03.345; *Postema v. Pollution Control Hearings Bd.*, 11 P.3d 726, 735–36 (Wash. 2000) (en banc).  Critically, however, we find no rule of Washington law granting interested members

§§ 90.03.110–.245 (describing procedures by which persons claiming vested water rights may petition for a judicial determination of their rights).

The Conservancy correctly argues that an APA plaintiff need not, as a general rule, establish a property interest in the litigation in order to demonstrate prudential standing. But the issue here is not the Conservancy's lack of property rights as such, but its lack of enforcement rights. Washington law does not give the Conservancy a right to the relief it seeks in this litigation. While a lack of state law rights is generally immaterial to establishing APA standing, it is highly relevant where, as here, the plaintiffs assert standing by virtue of a federal statute predicated on cooperative federalism and respect for separate sovereignty. The language and purpose of section 8 make clear that Congress did not intend to permit private parties who lack water rights a private right of action to compel enforcement of state law against federal agencies. Therefore, the Conservancy lacks prudential standing. *See, e.g., Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dept. of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005) (holding that plaintiffs asserting purely economic interest lack prudential standing under the National Environmental Policy Act because the statute does not reflect concern with economic interests that are divorced from concerns about the integrity of the physical environment).

---

of the public, such as the Conservancy, the right to initiate enforcement action to protect instream flows. Instead, the Department of Ecology is responsible for protecting instream flows through its general enforcement authority and by limiting new water uses to ensure that instream flows are met. *See*, *e.g.*, Wash. Rev. Code § 90.03.290.

Our concern over federal court interference with the administration of state water law is not theoretical. The record reflects that the Department of Ecology is well aware that the Federal Defendants periodically divert water from Icicle Creek at structure 2 and of the effect of Hatchery operations on instream flows and native fish passage in Icicle Creek. The Department of Ecology has conditioned its grant of a water quality certification for the Hatchery under section 401 of the Clean Water Act, 33 U.S.C. § 1341, on the Hatchery's adoption of a flow management plan designed to address these and other issues. The flow management plan describes the Hatchery's existing state water rights, as well as the Federal Defendants' practice of periodically closing the gates at structure 2 for flood control and groundwater recharge. Thus, the parties do not dispute that the Department of Ecology has actual notice of the Federal Defendants' periodic closure of the gates at structure 2 and the resulting diversion of water into the Hatchery Canal. Yet the Department of Ecology has never determined that this practice violates section 90.03.250 of the Washington water code nor directed the Federal Defendants to apply for a permit. From this we must deduce that the Department of Ecology either deems a permit unnecessary as a matter of state law or has elected to address the underlying instream flow and fish passage issues by alternative means such as the flow management plan.

This context is significant. In effect, the Conservancy seeks to override the Department of Ecology's interpretation of state law and exercise of enforcement discretion by securing a federal court order requiring the Federal Defendants to apply for a permit from the Department of

Ecology to continue diverting water at structure 2.[7]  Plainly, adjudicating the Conservancy's water code claim would be "more likely to frustrate than to further [the] statutory objectives" of section 8, *Nev. Land Action*, 8 F.3d at 716 (internal quotation marks and citation omitted), by forcing the Department of Ecology to adjudicate the need for a permit and by deputizing the Conservancy to compel enforcement of the state water code in a manner not provided by state law.

As the Supreme Court has emphasized, "[t]he legislative history of the Reclamation Act of 1902 makes it abundantly clear that Congress intended to defer to the substance, as well as the form, of state water law." *California*, 438 U.S. at 675. The State of Washington has elected to delegate authority to enforce its water code to the Department of Ecology and has not recognized a public right to independently enforce the permit requirement.  In this context, "it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399.  Thus, in this limited context, we conclude that the Conservancy lacks prudential standing to pursue its first claim.

---

[7] Context also distinguishes this case from *Natural Resources Defense Council v. Patterson*, 333 F. Supp. 2d 906 (E.D. Cal. 2004) ("*NRDC*"), a district court decision on which the Conservancy seeks to rely.  There, the state water agency supported the plaintiffs' argument that state water law applied, via section 8, to operation of a federal dam in California's Central Valley Project.  *Id.* at 908, 921.  Moreover, under the California law at issue in *NRDC*, the judiciary shares concurrent jurisdiction with the state water agency to enforce water code provisions implicating public trust rights, and the state water agency asserted that adjudication of the plaintiffs' claim would not conflict with the agency's prior decisions.  *Id.* at 921–23.  Thus, *NRDC* did not raise the federalism concerns that animate our analysis here.

III

The Conservancy's second claim similarly rests on the APA and section 8 of the Reclamation Act. Instead of the water code, however, it alleges underlying violations of Washington's fishway law, Wash. Rev. Code Ch. 77.57. Specifically, the Conservancy alleges that the Federal Defendants violate the fishway law by failing to (1) submit fishway plans to the Washington Department of Fish and Wildlife ("Department of Fish & Wildlife"), (2) maintain durable and efficient fishways on Hatchery structures that obstruct fish passage, and (3) supply existing fishways with adequate water. The first two arguments fail because the relevant provisions of the fishway law are not incorporated into section 8 of the Reclamation Act. The third argument fails because it does not challenge final agency action as required by the APA.

A

The Conservancy argues that the Federal Defendants violate Washington's fishway law by, *inter alia*, failing to submit fishway plans for approval to the Department of Fish & Wildlife and by failing to provide "a durable and efficient fishway" across Hatchery structures that block fish passage. Wash. Rev. Code § 77.57.030(1). In the Conservancy's view, these state-law violations also violate the Reclamation Act's requirement that federal reclamation projects comply with state laws "relating to the control, appropriation, use, or

distribution of water used in irrigation . . . ." 43 U.S.C. § 383.[8]

We disagree. A fair reading of section 8 does not support the Conservancy's argument, as the requirement to maintain durable and efficient fishways approved by the Department of Fish & Wildlife does not concern "the control, appropriation, use, or distribution of water." *Id.* As we have discussed, the goal of section 8 is to ensure that all water rights within a state, including those associated with federal reclamation projects, are subject to a uniform set of state laws. *California*, 438 U.S. at 668–69. Statutory provisions governing the physical design and maintenance of fishways do not implicate this goal, as they do not relate to the creation or exercise of water rights. The Conservancy's sole evidence that section 8 embraces the relevant fishway law provisions is a statement made in a House report indicating that Congress intended section 8 to encompass state law regarding the construction and operation of the reclamation "works themselves." H.R. Rep. No. 57-794, pt. 2, at 8 (1902). In light of the plain language and purpose of section 8, this statement is too thin a reed on which to rest.

B

Even assuming section 8 incorporates the fishway law's requirement that fishways continuously be supplied with sufficient water to freely pass fish, the Conservancy's claim that the Federal Defendants violate this provision cannot

---

[8] Again, we need not and do not decide whether the Hatchery is a "reclamation project" subject to section 8 of the Reclamation Act. Even assuming that it is, the Conservancy's fishway claims cannot proceed.

proceed under the APA because the suit does not target final agency action.

To maintain a cause of action under the APA, a plaintiff must challenge "agency action" that is "final." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 61–62 (2004). The APA defines reviewable "agency action" to include "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). While this definition is "expansive," federal courts "have long recognized that the term [agency action] is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006) (alteration in original) (internal quotation marks omitted). To qualify as "final," the action challenged must "mark the consummation of the agency's decisionmaking process" and "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations and internal quotation marks omitted).

Here, the Conservancy merely alleges that the Federal Defendants "operate dams 2 and 5 in a manner that obstructs fish passage through Icicle Creek during some or all of the year." This vague allegation is insufficient for two reasons. First, it does not identify a discrete "agency action" that fits within the APA's definition of that term. 5 U.S.C. § 551(13); *S. Utah Wilderness Alliance*, 542 U.S. at 62–63. While the Conservancy correctly argues that the act of closing the gates at structure 2 has immediate physical consequences, such action is not fairly analogous to a "rule, order, license, sanction, [or] relief." 5 U.S.C. § 551(13).

Our decision in *Siskiyou Reg'l Educ. Project v. United States Forest Service*, 565 F.3d 545 (9th Cir. 2009), is not to the contrary, as the Conservancy asserts. There, an environmental group challenged the Forest Service's interpretation of a Northwest Forest Plan provision that restricted mining activity in riparian reserves. *Id.* at 553. We rejected the Forest Service's argument that the plaintiff failed to challenge final agency action within the meaning of the APA. *Id.* The Conservancy seizes on our discussion emphasizing that the plaintiff's complaint referenced "specific instances of the Forest Service's actions taken pursuant to its interpretation" of the Northwest Forest Plan provision at issue. *Id.* at 554. This fact supported our conclusion that the plaintiff's suit did not advance "a programmatic attack or a vague reference to Forest Service action or inaction," which would not be reviewable under the APA. *Id.* The Conservancy argues that it, like the plaintiff in *Siskiyou Regional Education Project*, challenges final agency action because it targets the Federal Defendants' specific actions in periodically closing the gates at structure 2. This argument fails to account for the fact that the challenged Forest Service interpretation in *Siskiyou Regional Education Project* was embodied in a memorandum that formally articulated the agency's position. *Id.* at 552–53. Thus, the plaintiffs challenged a formal statement of agency policy that was fairly analogous to a "rule" and thus fell within the ambit of § 551(13). *See* 5 U.S.C. § 551(4) (defining "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . .").

The second reason that the Conservancy's claims do not implicate a final agency action is that the individual acts of

closing the gates at structure 2 do not "mark the consummation of the agency's decisionmaking process," *Bennett*, 520 U.S. at 177–78 (internal quotation marks and citation omitted), because they constitute day-to-day operations that merely implement operational plans for the Hatchery. *See Mont. Wilderness Ass'n, Inc. v. U.S. Forest Serv.*, 314 F.3d 1146, 1150 (9th Cir. 2003), *vacated on other grounds*, 542 U.S. 917 (2004) (holding that the agency's "routine maintenance work" on federal lands is not final agency action because these activities "implement [the agency's] travel management and forest plans" for the lands at issue).**[9]** The APA's requirement of final agency action precludes our undertaking "a general judicial review of the [Hatchery's] day-to-day operations." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990).

In sum, because this claim does not challenge final agency action, we lack jurisdiction to consider it.

---

**[9]** The Conservancy obliquely argues that it in fact challenges the Hatchery's 2006 "operations plan," which does constitute final agency action. The Federal Defendants respond that this plan is documented in the Hatchery's 2006 Biological Assessment, which was invalidated when we vacated the 2008 Biological Opinion for the Hatchery in *Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010) ("*Wild Fish I*"). In reply, the Conservancy insists that the defendants' preparation of a new biological assessment in response to our decision in *Wild Fish I* "does not demonstrate that the underlying agency action—the Hatchery's operations plan—has changed." But the Conservancy does not identify any document setting forth an "operations plan" separate from the Biological Assessment. Thus, there is no "underlying agency action" in the record of this appeal for us to review. Clearly, any challenge to the 2006 Biological Assessment was mooted by our decision in *Wild Fish I* and the U.S. Fish and Wildlife Service's preparation of a new Biological Assessment for the Hatchery in 2011. *See Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1124 (9th Cir. 1997).

IV

As we have often acknowledged, "[s]almon and hydropower are the two great natural resources of the Columbia River Basin," and ardent desires to promote one or the other have yielded a century of conflict. *Nw. Res. Info. Ctr.*, 35 F.3d at 1375. This iteration does not present the "classic struggle between environmental and energy interests," *id.*, but instead a more nuanced conflict between two entities seeking to repair the damage that dams have done to the Basin's fisheries. Unlike the many cases we have decided concerning the fate of fish in the Columbia River Basin, the claims before us are not susceptible to federal judicial review. Because the Conservancy lacks prudential standing to bring an APA challenge alleging that the Federal Defendants violate section 8 of the Reclamation Act by failing to comply with the Washington water code's permit requirement, we dismiss for lack of jurisdiction over that claim. We likewise lack jurisdiction over the Conservancy's claim that the Federal Defendants violate Washington's fishway law, Wash. Rev. Code § 77.57.030(1), by failing to submit fishway plans to the Department of Fish & Wildlife and by failing to maintain durable and efficient fishways across Hatchery structures, as these requirements are not incorporated into section 8. Finally, we lack jurisdiction over the Conservancy's claim that the Secretary's failure to supply Hatchery fishways with adequate water violates the Reclamation Act, because that claim does not challenge final agency action and consequently is not reviewable under the APA.

**DISMISSED.**